# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 14, 2013 Session

## STATE OF TENNESSEE v. CLAY STUART GREGORY

**Appeal from the Circuit Court for Humphreys County**
**No. 12005,  George C. Sexton, Judge**

---

**No. M2012-00546-CCA-R3-CD - Filed November 25, 2013**

---

The Defendant-Appellant, Clay Stuart Gregory, was convicted by a Humphreys County jury of aggravated robbery, first degree felony murder, and premeditated first degree murder.  The first degree murder convictions merged into a single conviction for which the trial court sentenced the Defendant to life in prison.  The trial court then sentenced the Defendant to eight years for aggravated robbery to be served concurrently to his life sentence.  On appeal, the Defendant argues: (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred when it refused to grant the Defendant's recusal motion; and (3) the trial court improperly denied the Defendant's motion to suppress.  Upon review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right,  Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Michael J. Flanagan (at trial), William D. Massey and Joseph A. McClusky (on appeal).

Robert E. Cooper, Jr., Attorney General and Reporter;  Brent C. Cherry, Senior Counsel; Dan M. Alsobrooks,  District Attorney General; and Margaret F. Sagi and Lisa Donegan, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from the shooting death of Eddie Lucas on Thanksgiving morning, November 26, 2009.  Mr. Lucas was found by his wife, Rachel Lucas, sitting on the couch in his home office with two gun shot wounds to the chest.  The Defendant was implicated in the murder, and subsequently indicted by the Humphreys County Grand Jury.

**Pretrial Motions.** Prior to trial, the Defendant filed a motion to suppress evidence seized from the search of his Toyota Tacoma truck, asserting that the truck was illegally seized and searched prior to the issuance of a warrant and that the warrant obtained was faulty because it did not establish probable cause sufficient to justify the search.

At the May 9, 2011 motion to suppress hearing, Chief of Police David Daniel testified that on the day of the Defendant's arrest at his parents' home, Sheriff Chris Davis informed him that he smelled a strong odor of marijuana coming from the Defendant's vehicle and that as he approached the vehicle, he "noticed that as well." He further testified that "you didn't have to get close to the vehicle to smell [the marijuana]. It was some strong marijuana. . . . There was no doubt in my mind that is was marijuana." He explained that he originally approached the truck because he was concerned that "if this was truly involved in a homicide could there be an injured person in the vehicle, another person in the vehicle." He was concerned about safety. When he looked in the window of the truck, he noticed a lot of clutter and saw a black gun case and a shotgun lying beside it. He stated that it he could clearly see inside the truck without sticking his head inside or using a flashlight. He discussed the situation with Sheriff Davis, and the two decided to secure the truck in the Waverly Police Department sally port, a secure garage area beside the police department. He explained that he "took the keys, rolled up the windows, put the keys in the seat and closed the door, that was it. . . . [M]e nor anybody else that I know actually went through the vehicle." He called a wrecker service, had the truck towed to the sally port and unloaded, and put police line tape around it to ensure it was not touched. He opined that because he smelled the marijuana in the truck, he would have been able to search it at that moment, but he decided not to search it because he did not "want to take a chance messing anything up on a marijuana search when that vehicle was tied to – potentially tied to a homicide." He explained that in these types of serious cases, "it's been basically standard procedure to secure it well, keep it under lock and key and apply for a search warrant." On cross-examination, he reiterated that he secured the vehicle, but he did not "lift anything up or touch anything inside of the vehicle." He opined that it would have been "poor police work" to leave the truck at the Gregory home and that it was much safer to secure it at the sally port. He conceded that he made no effort contact a judge on Thanksgiving Day, the day of the arrest, to apply for a search warrant.

Sheriff Chris Davis likewise testified about the strong odor of marijuana coming from the Defendant's truck. He stated that he immediately recognized it as marijuana, and told Chief Daniel about the smell. He testified that they walked over to the truck and looked in the windows, which were down, and saw a shotgun and a gun case in the back seat area. He explained that he did not open the doors, but viewed the gun from outside of the truck. On cross-examination, Sheriff Davis also conceded that he did not attempt to contact a judge on the day of the arrest to secure a search warrant. He stated that he had no recollection of being

in the Defendant's truck at any point. On redirect, Sheriff Davis opined that he "absolutely" had probable cause to search the truck on the scene when he smelled marijuana coming from it.

Agent Joe Craig of the Tennessee Bureau of Investigation testified that he obtained a search warrant on November 27, 2009, for the Defendant's Toyota Tacoma pickup truck. He executed the search warrant later that day and seized a 12-gauge shotgun, a black plastic gun case, binoculars, outdoor gear, clothing, paperwork and notes, and marijuana. On cross-examination, he acknowledged that he did not attempt to contact a judge on November 26, 2009, the day of the Defendant's arrest. He also acknowledged that his affidavit for the search warrant did not include any reference to marijuana.

Clyde Gregory, the Defendant's brother, testified that he saw Sheriff Davis get inside of the Defendant's truck while it was parked at his parents' home. He explained that Sheriff Davis asked him if the Defendant had any guns, to which Mr. Gregory responded yes, and then the Sheriff "walked over [to the truck] and opened the passenger side – I mean the driver's side of the truck and started looking through the clothes and stuff." On cross-examination, Mr. Gregory stated that he did not smell marijuana coming from the truck, but he further acknowledged that he was not in a position to smell it had it been there. He stated that Sheriff Davis commented that the truck "smelled like pot. And I commented – after I think about it the more it smelled like somebody had been living in the truck, not pot." He testified that he was certain he saw Sheriff Davis go into the truck, and estimated that he searched though the truck for three to four minutes.

Following the hearing, the trial court made oral findings and denied the Defendant's motion. The court stated in relevant part:

Let's think about what we got. We know for a fact that Eddie Lucas is dead. We have at least probable cause, if not almost a sure thing, that the killer was Stuart Gregory. He was identified. And, apparently, not only did law enforcement know it, was pretty sure about it, apparently half of New Johnsonville knew it and was pretty sure about it.

We knew Mr. Lucas was killed with some type of weapon. They obviously had reason to believe that the [D]efendant might be armed. And, obviously, he's killed somebody so he is dangerous.

They know almost beyond a reasonable doubt what type of vehicle or the vehicle they're looking for. . . . They know it's [the Defendant]'s vehicle. They find the vehicle. It's registered to [the Defendant]. They take [the

-3-

Defendant] into custody. And whether Sheriff Davis went into the vehicle or not is irrelevant.

This court's of the opinion he had probable cause at that point in time to search the vehicle for evidence of a crime, for weapons or anything else that might be available in this murder investigation. It could've been searched right there. Not only did they have probable cause to search the vehicle, they had [exigent] circumstances. The testimony – they had double probable cause. They had probable cause to search for evidence of a crime, weapons, et cetera, and they had probable cause because the sheriff and Chief Daniel both testified there was a strong odor of marijuana coming from the vehicle.

The court denied the Defendant's motion to suppress, concluding that the truck was not subject to an illegal search and that the warrant obtained was based upon probable cause. At that point, defense counsel made an oral motion for the judge to recuse himself, stating: "I think the court knows that I have to now file a motion for the court to recuse itself. You can't act as a 13th juror based on the comments made today about overwhelming evidence that he's a killer." The court denied the motion, and the Defendant renewed that motion in writing on June 13, 2011.

**Trial.** The following proof was adduced at trial. Rachel and Eddie Lucas lived at 436 River Oaks Drive in New Johnsonville, Tennessee. The couple began dating in 1975, and married in 1976. Mr. Lucas started his own construction company in 1963, and Mrs. Lucas became involved in the business after the two married. Mr. Lucas built their home on River Oaks Drive, which they moved into in 1997 and lived in together until the time of Mr. Lucas's death in 2009.

Mrs. Lucas testified that she had known the Defendant for over thirty years. The two originally met when the Defendant dated one of her best friends in high school, Ann Reeves. The Defendant left New Johnsonville for a time, and Mrs. Lucas did not see the Defendant again until 1998 when he "stopped by" the Lucas residence. He told Mrs. Lucas that "he was in the military and he had a couple of girls and he was married." He returned to town again in 2008 for a high school class reunion. He called Mrs. Lucas in October 2009 in an attempt to reconnect with Ann Reeves. Mrs. Lucas testified that he "called to say hello and wanted to know if we ever see Ann, his old girlfriend, my best friend since tenth grade, anymore and I told him that we do. . . . [H]e kept asking more and more about her and when I was going to see her next."

Mrs. Lucas testified that the Defendant came by her home on November 1, 2009, and "said he wanted Ann's [phone] numbers and her address." He stayed for approximately 30

to 45 minutes and used Mr. Lucas's computer located in his office to find the address and get directions. Mrs. Lucas stated that Mr. Lucas was "[a]nnoyed" that the Defendant was at their home. The next encounter Mrs. Lucas had with the Defendant was November 26, 2009 in the early morning hours of Thanksgiving Day. Mr. Lucas had gone to bed early, as was his routine, while Mrs. Lucas was "sitting on the sofa in the den half asleep watching an old movie." She testified that she was awakened by "really loud knocking on the side door" of her home at 12:30 a.m. She turned off the television and sat quietly hoping that "whoever it was would go away."

After a few minutes, she heard the front doorbell ring and decided to look outside to see who was there. She testified that she looked out the office window and "the motion detector light had [come] on from his movement and clearly there sat [the Defendant]'s truck." Mrs. Lucas decided to get ready for bed, and then she returned to look out the window to see if the Defendant was still outside. She testified:

> I was just curious and annoyed and so I crept down the hall and put just an eyeball, just my – like the side of my face just around the door facing to see if there was anybody on that side porch and then I saw him standing there. . . . [the Defendant] standing on my side porch. . . . I could see his profile and his tall self looking in the door. I clearly saw the outline of his face. It wasn't like it was broad daylight . . . but it was clearly him[.]

Mrs. Lucas explained that she was annoyed but not afraid, and decided to go to bed without telling Mr. Lucas about the Defendant. She stated that "[the Defendant] was just a nuisance and I just thought he'll go away so I just didn't bother Eddie with it."

On Thanksgiving morning Mr. Lucas woke up to begin his day around 4:00 a.m., as was his routine. Mrs. Lucas testified that she told Mr. Lucas "that [the Defendant] had been banging on the side door and ringing the front doorbell but I didn't let him in. . . . I told him that I was afraid he might still be out there, I didn't know." She stated that Mr. Lucas walked down the hall to look, and when he returned she "knew that [the Defendant] was still out there." She testified that she then slept soundly until 9:00 a.m. when she was suddenly awakened:

> I was sound asleep and all of the sudden I heard bang, bang, so I immediately jumped out of bed; and as I was jumping out of the bed the clock was right in front of me and it was [nine] o'clock.

> . . .

And I was thinking to myself, those are slamming doors, they must be fighting. It sounded like gunshots. It can't be gunshots, it just can't be gunshots.

. . .

I just ran as fast as I could into the closet and threw on a robe because – and then I slid on my shoes and then I went running through the door to the hall and I got to the side entry door and it was closed. So I opened the side entry door and straight in front of me through the clear glass oval window stood [the Defendant]. So I'm just looking at him and I'm thinking that's [the Defendant], where's Eddie . . . and I'm getting more nervous and I'm thinking it just couldn't have been gunshots, where's Eddie.

. . .

And I got a little closer to [the Defendant] and he's just standing there and he's got his hand on the doorknob closing the door and then he goes like this (demonstrating) with his shoulder like it hurt or something and his – I could see his – I couldn't see his whole face but I saw the side of his head and his profile and his hand on the doorknob.

And then I looked to the side, and I'm saying Eddie, Eddie, Eddie, and he's not saying anything and I see him sitting there on the sofa and he isn't responding at all and I get closer and I see two shots, two holes in his chest.

Mrs. Lucas testified that as she approached her husband, she looked out the window and saw the Defendant's truck driving down the road. Mrs. Lucas then called 911 to report the shooting. The 911 recording was played for the jury, and on the recording Mrs. Lucas is heard telling the dispatcher, "I think I see him leaving . . . [in] a silver truck. I think his name is Stuart Gregory . . . I don't know. I didn't see, but I think that's who it is." When asked about her equivocal statement to the 911 dispatcher identifying the Defendant, Mrs. Lucas explained, "I guess it's because I didn't actually see [the Defendant] shoot [Mr. Lucas], but I got there just so quickly and there he was."

She testified that on November 25, 2009, the day before the murder, she ran several errands with Mr. Lucas, and when he opened his wallet to give her some money for the store she saw "a lot of money in the wallet." She explained that Mr. Lucas always carried "quite a bit of money. . . . usually several hundred dollars." Following the murder, Mr. Lucas's wallet was found on his desk with no money in it. Mrs. Lucas testified that it "definitely" should not have been empty and that they had not spent any of the cash that she had seen in

-6-

the wallet the day before. Mrs. Lucas admitted to having an affair with James Bratton from 2001 until her husband was murdered in 2009. She stated that Mr. Lucas was aware of the affair and that she never intended to leave Mr. Lucas. She insisted that she never lied to a member of the district attorney's office about the affair and that she had disclosed that information very early on in the case.

On cross-examination, Mrs. Lucas conceded that both she and Mr. Lucas had affairs during their marriage, but she rejected the notion that they had an open marriage. She also acknowledged that the Defendant had spent the night at the Lucas residence with permission on several occasions. She reiterated that her equivocal identification of the Defendant to the 911 dispatcher was simply because she "didn't see [the Defendant] shoot [Mr. Lucas]."

Jerry Matney lives at 407 River Oaks Drive in a home built by Eddie Lucas. He testified that Mr. Lucas was a "household name" in New Johnsonville and had built many of the homes in the River Oaks Drive neighborhood. He often saw Mr. Lucas while on his daily morning walks and the two would stop and talk. On Thanksgiving morning 2009, Mr. Matney left for his daily walk at approximately 6:30 a.m. When he walked past the Lucas residence, he noticed a truck in the driveway that he did not recognize. He explained, "I saw Eddie Lucas'[s] Ford truck sitting in the normal spot in his driveway, [and] directly behind it, a few feet behind his truck, was another truck. . . . it appeared to be silver."

At the time of the offense, Linda Moore and her daughter, Jessica Lanier, worked at Thompson's One Stop in New Johnsonville, Tennessee. Ms. Moore testified that she was high school classmates with the Defendant, and although she did not immediately recognize him, he came into the Thompson One Stop on Thanksgiving morning 2009 at approximately 7:00 a.m. She testified that the Defendant asked for a cigarette and "mentioned that he didn't have any money or he didn't have enough money to buy a pack of cigarettes." Ms. Moore directed him to the "regulars" in the back to ask for a cigarette, which he did. She stated that he and one of the regulars, Tim "Catman" Gantlett, walked outside to smoke. Ms. Lanier, who did not know the Defendant at the time, identified the Defendant in the courtroom as the man that came into Thompson's One Stop on Thanksgiving morning 2009. She described him as "really tall" with a "tat[t]oo on his eye," and said that he had a strong smell, "like a drug smell, like marijuana or something." She also stated that he was driving a silver Toyota Tacoma. Ms. Lanier testified that she learned about the murder of Mr. Lucas about an hour after the man left.

Tim "Catman" Gantlett testified that on Thanksgiving morning 2009 he was at Thompson's One Stop where he was one of the "regulars" who came in to drink coffee and talk. He stated that the Defendant, an old high school classmate, came into the store that morning. He did not recognize the Defendant at first because it had been many years since

he had seen him, but the Defendant introduced himself and things "went from there." He explained that the Defendant wanted a cigarette so he gave the Defendant a cigarette and the two went outside to smoke. Mr. Gantlett said that the Defendant explained that "he had a check or something like that and they wouldn't cash it" so he did not have money to buy cigarettes. He stated that while they were outside the Defendant retrieved a gun from his truck to show Mr. Gantlett. Mr. Gantlett testified that it was a Remington 12-gauge pump shotgun. The Defendant handed the gun to Mr. Gantlett and "wanted [him] to look at it and act like [he] was aiming at something . . . [to] see how it handled." Mr. Gantlett returned the gun to the Defendant and the two talked for a little while longer. The Defendant told Mr. Gantlett that he had "been over there [on River Oaks Drive] to see Pam and Greg [Gunn] and Pam was a little bit sick . . . [and] Rachel [Lucas] wasn't feeling good." The Defendant left the premises in his Tacoma truck and Mr. Gantlett left shortly thereafter, about 8:30 or 8:45.

Nicole Reeves worked at Cooley Shell Station in Waverly, Tennessee in November 2009. She testified that on November 22, 2009, a man came into the store to purchase "cigarettes and something to drink." Ms. Reeves noticed that the man had a lot of tattoos and explained that "me being into tat[t]oos and stuff like that we got to talking about his tat[t]oos . . . and I told him that I did my tat[t]oos myself and he asked me to do some tat[t]oo work on him." The two met at her house after she got off work, and he requested that she do "a cover-up on his ring finger of a cross, [to] cover up the name 'Christie' that was written in cursive." He then requested that she do a teardrop below his eye "in memory of a lost loved one." She described him as "a bit excited" but "easy to get along with." She testified that he paid one hundred or one hundred and twenty dollars in cash for the tattoo work. A few nights later, the man returned and asked Ms. Reeves to do some more tattoo work for him. She said he was "acting quite a bit more hyper and kind of angry about something." She declined to do any work at that time. Sometime later, the man called Ms. Reeves and "wanted to know if [she] could . . . cover up the teardrop [she] put on his eye or put something else there instead." She once again declined. She was uncertain of the exact date that the man called but stated that "[i]t wasn't December yet." She identified the Defendant in the courtroom as the man that she had done the tattoo work for and identified the teardrop on the Defendant's face as her work.

Stacie Edwards and her husband, Lieutenant Rob Edwards of the Humphreys County Sheriff's Department, live at 443 River Oaks Drive. On Thanksgiving morning 2009, Mrs. Edwards ran past the Lucas residence at approximately 7:45 a.m. while on her daily run. She testified that she noticed "a truck parked in the circle drive and a man standing by the door of the truck and he threw his arm up and waved." She described the truck as light-colored and the man as "[a] tall man, as tall as the truck, and when he [] threw his arm up and waved it was – it extended past the truck." She stated that Mr. Lucas's truck was also in the driveway, near the garage door. She returned home at about 8:30 a.m. and began preparing

dishes for the Thanksgiving meal. She explained that her husband was sleeping because he worked the midnight shift the night before. At about 9:00 a.m., Ms. Edwards heard a dispatch on her husband's radio about a shooting on River Oaks Drive [70-71]. She awoke her husband and told him about the shooting, and he "immediately got up, starting putting his clothes on[,]" and left for the scene within five minutes. On cross-examination, Ms. Edwards acknowledged that the person she saw in the Lucas driveway did not seem concerned that Ms. Edwards had seen him.

In November 2009, Pam and Greg Gunn lived at 416 River Oaks Drive. They went to high school with the Defendant. Mrs. Gunn testified that she had known the Defendant since 1974 and that her husband and the Defendant were best friends in high school. She explained that they lost touch with the Defendant through the years but that when he was in town he would stop by to see her husband. She testified that in November 2009, the Defendant came by her home several times in the week before Thanksgiving. During one of those visits, the Defendant told Ms. Gunn that he was going to divorce his wife, Christie, and was going to marry Jacqueline Peek. She testified that the Defendant returned on Monday night during the week of Thanksgiving, but he rang the doorbell and left before Mr. Gunn could answer the door. To her knowledge, the Defendant did not come by her house on the night before Thanksgiving.

On Thanksgiving morning, Mrs. Gunn left her home at about 7:40 a.m. to run a few errands. She stated that when she drove by the Lucas residence she "noticed that [the Defendant]'s truck was in front of [their] house." She returned to the neighborhood a little after 8:00 a.m. and saw the Defendant's truck in the Lucas's driveway again, but facing the other direction. Mrs. Gunn returned home and called her neighbor, Dawn Dodd, who lives directly across the street from the Lucases. At approximately 8:20, while on the phone with Mrs. Dodd, Mrs. Gunn saw the Defendant pull into her driveway and then "just turn[] around in our driveway and [go] back out." Mrs. Gunn testified that when she saw the Defendant pulling into her driveway, she locked the door to her home because she thought the Defendant's "behavior was odd. . . . I had just gotten leery." Mrs. Gunn stated that she did not see where the Defendant went after he left her driveway, and opined that the Dodds have the best vantage point to see the comings and goings in the Lucas driveway.

Dawn and Scott Dodd lived at 419 River Oaks Drive, directly across the street from Eddie and Rachel Lucas. Mrs Dodd testified that she can see the "whole [Lucas] house from the front of my house," and that from the window in by her husband's computer desk, she can see the Lucas's driveway without any obstructions. Mrs. Dodd testified that on Thanksgiving morning 2009, she saw a Toyota pickup truck in the Lucas's driveway on the left end of the house. She first saw the truck before 8:00 a.m., and said that she tried to call her friend Pam Gunn because she had "been warned . . . [to] watch out for it." She explained

that she continued to watch the truck in the Lucas's driveway "on and off and every time that I would look out the window the truck would move from the left side of the house to the front." She testified that she saw a man in a chocolate brown shirt get out of the truck at one point, and she did not see anyone at the Lucas's house that was not associated with the truck.

Scott Dodd testified that on Thanksgiving morning 2009, he left his house to run a few errands and returned at approximately 8:40 a.m. He stated that when he returned home, he saw a "four-door silver Toyota Tacoma sitting on the end of the house at the Lucas'[s] garage doors." He went inside his home, "milled around the house a minute and [] went and got on [his] computer" at the computer desk from which he had a clear, unobstructed view of the Lucas home. After several minutes, he noticed a "silver Toyota pull out of the driveway," which looked like the same truck he had seen parked in the Lucas driveway when he returned home. He stated that it was "around 9:00 [a.m.]" when he saw the truck leave and within three or four minutes he saw a police car pull up to the Lucas residence.

Lieutenant Rob Edwards of the Humphreys County Sheriff's Office lived at 443 River Oaks Drive with his wife, Stacie Edwards. On November 26, 2009, Lt. Edwards worked the midnight shift, and returned home to sleep a little after 6:00 a.m. after his shift had ended. At approximately 9:00 a.m., Mrs. Edwards woke Lt. Edwards to inform him about a shooting on River Oaks Drive that she had heard announced over his radio dispatch. He testified that he immediately got out of bed and got dressed, grabbed a weapon, and drove to the address that he had obtained from dispatch, which was the home of Eddie and Rachel Lucas. He estimated that the address was about a tenth of a mile from his house on River Oaks Drive.

When Lt. Edwards approached the side door of the Lucas residence, he was met by Mrs. Lucas. He recalled that Mrs. Lucas was dressed in "sleeping attire" and appeared to be "pretty frantic" when he arrived and told him several times that Mr. Lucas needed help. Lt. Edwards testified that Mr. Lucas had gunshot wounds to the chest and had "tattered holes in his shirt and then a little bit of blood protruding from that area." Lt. Edwards checked Mr. Lucas's vitals and determined that "he was neither breathing [n]or had a pulse," but noted that his skin was "still warm to the touch." Lt. Edwards testified that Mrs. Lucas told him that the Defendant had shot her husband, and said that she never equivocated about the suspect's identity. On cross-examination, he acknowledged that his report did not include anything about Mrs. Lucas seeing the Defendant turning the doorknob and going out the door.

Phillip McCay, a resident of Humphreys County, testified that on Thanksgiving morning 2009, he planned to meet a friend named Tina Hamm at an abandoned house off

Woodland Drive, which he later learned belonged to the Peek family.[1]  Mr. McCay testified that he arrived prior to Ms. Hamm at approximately 8:30 a.m.  Before Ms. Hamm arrived, a man arrived driving a silver truck.  Mr. McCay recalled that he heard sirens about the same time that the man arrived on the property.  Mr. McCay sent a text message to Ms. Hamm and told her to wait because someone else was at the house.

Mr. McCay stated that the man identified himself as "Stu Gregory" and said that he wanted to show Mr. McCay his new shotgun.  The man told Mr. McCay he wanted to check the pattern by shooting it and then shot a block wall twice.  Mr. McCay explained that it was a pump shotgun, and that the man had to eject the first shell and load a second shell to shoot again.  He recalled that the man did not pick up the shells after shooting the gun.  The man informed Mr. McCay that the property belonged to his future mother-in-law.  He wrote down his name and number on a card and gave it to Mr. McCay, and Mr. McCay did the same.  After shooting twice, the man made sure the gun was empty and then handed the gun to Mr. McCay to examine.  Mr. McCay returned the gun and told the man he had to leave.  He stated that he left the premises first and then man got in his truck and left too.

Mr. McCay estimated that the two stayed on the property for about fifteen minutes, and recalled that he smelled "a strong odor of marijuana" coming from the man's truck.  After learning of the murder of Mr. Lucas, Mr. McCay contacted the New Johnsonville Chief of Police, Wayne Ellison, and told him about his encounter that day.  He explained: "[M]y fingerprints [were] on the gun and, you know, my name and all was there in his pickup . . . I just thought it would be relevant to let them know that . . . he had drove up on me and that I had had contact with him."

Tina Hamm testified that on November 26, 2009, she planned to meet Phillip McCay at an abandoned house off Woodland Drive.  She explained that before she arrived at the house, Mr. McCay sent her a text message to tell her to wait because someone else was at the property.  She testified that she waited across the street from the property, and between 9:30 and 10:00 a.m. she saw Mr. McCay's truck and another truck pulling out of the property.  She described the other truck as a "kind of silver, pewter colored truck, king cab, brand new looking."

Clyde Gregory, the brother of the Defendant, was at the Kwik-N-Ezy Market getting gas on Thanksgiving morning 2009 when he was informed about the murder of Eddie Lucas and was told that police were looking for his brother.  Mr. Gregory testified that after learning of the murder, he immediately drove to his parents' home, located in Waverly,

_____

[1] Based on testimony by Sheriff Davis, the Peek property is approximately three to four minutes from the Lucas residence on River Oaks Drive. [XI: 838]

-11-

Tennessee.[2]  When he arrived he saw the Defendant's truck pulling into the driveway.  Mr. Gregory testified that he approached his brother, asked if he was alright, and then checked his pockets where he found two spent shotgun shells.  He later turned those shells over to Chief Daniel of the Waverly Police Department.  When asked why he patted down the Defendant, Mr. Gregory testified that the Defendant often had a pistol in his pocket so he "wanted to make sure he didn't have that pistol on him."  Soon after the Defendant's arrival, the Defendant's mother called the police to inform them of her son's whereabouts.  When police arrived at the Gregory home, Clyde Gregory escorted the Defendant outside to be taken into custody.  Mr. Gregory acknowledged that his brother owned a number of firearms, including a shotgun, a deer rifle, and several pistols.  He also stated that a few days before Thanksgiving 2009, he had given the Defendant a hand full of 12-gauge shotgun shells of different sizes.

Jacqueline Ann Peek testified that in November 2009, she was living in Knoxville, Tennessee and was engaged to the Defendant.  She explained that the two had dated in high school and rekindled their relationship in November 2009.  She testified that one day after getting back together, the Defendant proposed to her in front of her family.  She acknowledged that he was still married at the time but stated that she told him that she would marry him if he divorced his wife.  Following the proposal, the two decided to "get[] everything out on the table since [they] had planned to be married" so they had a conversation where they "confess[ed]" to one another.  Ms. Peek testified that during this conversation, she told the Defendant about her relationship with Eddie Lucas, which she described as someone that she "partied with."  She stated that the relationship lasted for about twenty-four years and ended in 2004.  She testified that during the week of Thanksgiving 2009, the Defendant traveled to Waverly to visit his mother.  On Thanksgiving Day at 1:46 a.m.,[3] she received a phone call from the Defendant who told her that he was sitting in the Gunn's driveway after being kicked out of a local bar.  During that phone call, he told her that he loved her and would see her later that day for Thanksgiving dinner.

David Peek, the brother of Jacqueline Ann Peek, testified that he had not seen the Defendant in many years until the Defendant rekindled a relationship with his sister.  The Defendant came with Ms. Peek to Mr. Peek's home in mid-November.  Mr. Peek described the Defendant as in "a very boisterous, almost euphoric mood" on that occasion.  A few days

_____

[2] Based on testimony by Sheriff Davis, the Gregory family home in Waverly, Tennessee is approximately twenty minutes from the Peek property in New Johnsonville, Tennessee [XI: 838].

[3] Knoxville, Tennessee is located in the Eastern Standard Time Zone, while Humpreys County is located in the Central Standard Time Zone; therefore, it would have been 12:46 a.m. in Humpreys County at the time of the Defendant's phone call to Ms. Peek.

later, on November 17, 2009, the Defendant and Ms. Peek announced their engagement at Mr. Peek's home. Mr. Peek testified that he was a little shocked because it was "very sudden – and, you know, very overt . . . it was kind of a commanding situation that, you know, this is – this is what's going to happen." Mr. Peek stated that after the engagement he offered to pawn the Defendant's motorcycle for three thousand dollars because the Defendant told him he was having difficulty pawning it. On Saturday, November 21, 2009, he gave the Defendant three hundred dollars in cash and wrote him a check for two thousand seven hundred dollars for the pawn.

James Bratton, who lives in northern Virginia, testified that he has known Mrs. Lucas since high school. The two dated for four years but parted ways in college and married other people. They reconnected in 2001 and began a relationship. Mr. Bratton testified that on Thanksgiving day 2009, he was northern Virginia and ate dinner at his boss's home. He stated that he had no animosity towards Mr. Lucas and was not involved in his death.

Chief Deputy Joe Maples of the Humphreys County Sheriff's Office testified that on Thanksgiving morning 2009, a call came out over dispatch at approximately 9:00 a.m. that informed officers of a shooting on River Oaks Drive. He immediately proceeded to the address given and arrived at approximately 9:15 a.m., shortly after Lt. Edwards. He started a crime log at that time to keep a record of everyone that entered the crime scene that day. He testified that right outside of the house he "noticed a smell of . . . marijuana." Wayne Ellison, the New Johnsonville Chief of Police, testified that he was contacted by Chief Deputy Maples about the murder of Eddie Lucas on Thanksgiving morning and he went to the Lucas residence to assist in the investigation. He testified that he was later contacted by Phillip McCay with information concerning the Defendant. The following day, November 27, 2009, he set up a meeting with John Ethridge, a criminal investigator for the District Attorney's Office, to take a statement from Mr. McCay. Mr. Ethridge testified that based on Mr. McCay's statement, he investigated the Peek property off Woodland Drive later that day. At that location, he gathered two spent shotgun shells, pieces of a torn Gorilla Ground Blind Tent box, and two concrete blocks from the wall that Mr. McCay indicated had been fired upon by the Defendant.

Humpreys County Sheriff Chris Davis was alerted of the murder of Eddie Lucas on the morning of November 26, 2009 and was told "there was a suspect and it was Stuart Gregory." Sheriff Davis testified that he contacted the Defendant's mother, Mrs. Sue Gregory, whom he had known for a long time, and asked "that if [the Defendant] returned home to please dial 911, that there had been an incident that we're needing to locate him and discuss things and matters with him about." Mrs. Gregory contacted police soon after, and informed them that the Defendant was at her home. Sheriff Davis contacted the Waverly Chief of Police, David Daniel, to assist in taking the Defendant into custody. Sheriff Davis

testified that after taking the Defendant into custody, he walked by the Defendant's truck and smelled "a strong odor of marijuana coming from the vehicle."

Chief Daniel of the Waverly Police Department also testified that he "immediately noticed the smell of marijuana from the vehicle" after taking the Defendant into custody. Chief Daniels explained that because the vehicle had been seen leaving a crime scene his "first instinct was is there anybody else in the vehicle that could harm me or us . . . so I looked inside the vehicle through the windows." At that point, he noticed a shotgun lying on the floorboard. Chief Daniels testified that he and Sheriff Davis decided to secure the truck in the Waverly Police Department sally port, a garage area that can be completely enclosed and has video surveillance. He stated that he called a wrecker service, put the Defendant's car keys inside of the truck, rolled up the windows, and watched it get rolled onto the wrecker truck. He testified that he did not "pilfer through the vehicle or anything like that . . . that's the only contact I had inside the vehicle." Two Waverly patrolmen escorted the wrecker truck to the sally port and unloaded the Defendant's truck into the secured area where it was taped off to indicate that the truck was not to be touched. Chief Daniel stated that after the Defendant and his truck were removed from the premises, he spoke with the Gregory family. He stated that before he left, Clyde Gregory "reached over into the trash can inside the house and pulled up two spent 12-gauge shotgun casings . . . and gave those to me and told me that those [came] out of the [D]efendant's jacket pocket earlier that morning."

Special Agent Joe Craig of the Tennessee Bureau of Investigation was contacted on Thanksgiving morning 2009 about the murder of Eddie Lucas. He arrived at the scene at approximately 11:50 a.m. and entered the Lucas residence through the side door. He testified that he "recall[ed] an odor of marijuana as [he] entered into the home." He discovered Mr. Lucas's wallet on Mr. Lucas's desk in his office and found no cash inside. He also observed paper wadding on the floor in Mr. Lucas's office, which he described as "what is encased in a shotgun shell . . . . [and] will extract through the barrel as well behind the shot." He testified that he collected a marijuana cigarette from outside of the Lucas home to submit to the TBI crime lab to be analyzed for DNA. He later obtained a DNA buccal swab from the Defendant to submit to the TBI crime lab for comparison. Agent Craig testified that a green, leafy plant material was found inside of the Defendant's center console in his truck, which had the "odor and texture of marijuana." He further testified that he received cash money from the officers at the Humphreys County Jail that was found on the Defendant at the time of his arrest, which totaled nearly eight hundred dollars.

Agent Craig was later recalled as a witness and testified that he found a note on a piece of scrap paper in the Defendant's truck. Mrs. Lucas was also recalled and identified her husband's signature on the scrap paper. She explained that "[w]hen we would receive

-14-

mail that was blank, part of it, instead of just throwing it away, I would cut it up for scrap paper." She would then place the scrap paper on Mr. Lucas's desk for his use. She believed that the scrap paper found in the Defendant's truck was from her husband's desk because it was from an insurance mailing from Saul Beard, the Lucas's insurance agent, which she routinely cut up for scrap paper.

Agent Charles Hardy of the Tennessee Bureau of Investigation testified that he works in the Nashville crime laboratory in the serology and DNA unit. In relation to this case, he conducted the DNA analysis of the marijuana cigarette found at the Lucas residence and compared it to the buccal swab obtained from the Defendant. He testified that DNA profile from the cigarette matched the DNA swab from the Defendant, and emphasized that he was "very certain" it was a match. He further explained: "When we have a match[,] . . . we're able to generate a statistical statement to give weight to that association. . . .[W]ith the statistical number that was calculated on this, you would have to search about a hundred million times over the world population, at least, to find a profile that would match."

Dr. Thomas Deering, a forensic medical examiner, conducted the autopsy on the victim, Eddie Lucas. After conducting the autopsy, Dr. Deering concluded that "the cause of death is multiple gunshot wounds and the manner of death is homicide." He further concluded that both gunshot wounds were "individually and corporately" fatal, and that taken together, the victim would have lived only a few seconds. He testified that in addition to the pellets from the shotgun shells, he also found paper wadding and a fragment of a plastic shot cup, which indicates that the muzzle of the gun was fairly close to the body when fired. He stated that he conducted a toxicology exam on the victim, which screens for a number of drugs including marijuana. The toxicology report came back negative, meaning that there were no reportable levels of any drugs in the victim's system at the time of his death.

Agent Alex Brodhag, a firearms examiner for the Tennessee Bureau of Investigation, testified as an expert witness regarding the ballistics evidence in this case. He conducted a firearms examination on the evidence collected in the case and generated a ballistics report of his findings. He testified that he tested the shotgun recovered from the Defendant's truck and that it was working properly. He demonstrated for the jury how to fire multiple shots from the gun and explained that after firing the gun, the spent shell would not eject automatically. He explained, "it would be necessary to bring the fore-end back, that ejects the spent or fired shotshell, then bringing the fore-end back then forward will take a new shot shell out of the magazine tube, load it into the chamber and it's ready to fire again."

Agent Broghag further testified that he conducted a test on the four 12-gauge shotgun shells recovered in this case to determine if they had been fired from the Defendant's gun. The shells recovered included two shells labeled "kitchen trash," which were handed over

to police from Clyde Gregory at the Gregory family home, and two shells recovered from the Peek property off Woodland Drive. After testing the shells, he concluded that both sets of shells had been fired from the Defendant's gun. He also testified that the shot size of the "kitchen trash" shells was No. 6, while the shot size of the Woodland Drive shells varied, with one being No. 6 and the other being No. 7 ½. All four shells were manufactured by Winchester.

Agent Broghag also received several pieces of evidence from the medical examiner that were removed from Mr. Lucas's body, including two fired shots sleeves, a fired fiber filler shot wad, a fired overpowder wad, and thirty-four fired shot pellets. He testified that these items were "consistent with a 12-gauge [shotgun]," and the pellets were "consistent in size with No. 6 shot." He also received several pieces of clothing worn by the victim during the murder in order to conduct a "muzzle-to-garment distance determination" test. Based on that test, he concluded that shot "A" was likely fired from a distance "greater than [nine] feet but less than [fifteen] feet," and shot "B" was fired from a distance "greater than [five] feet but less than [twelve] feet."[4]

On cross-examination, Agent Brodhag conceded that he based his opinion regarding the size of the shot on the printed number on the shell and that shells can be reloaded with different size shot. He also acknowledged that he could not say that the pellets recovered from Mr. Lucas's body were fired from the Defendant's shotgun. On redirect, Agent Brodhag further testified that it is sometimes possible to tell whether a fired shot has been reloaded because there may be additional markings on the surface from previous firings, and in this case, there was nothing to indicate that the shells he examined had been reloaded.

Following the conclusion of the State's evidence, the Defendant informed the trial court that he did not wish to testify, and the defense rested its case. Based upon the evidence presented, the jury convicted the Defendant on all three counts. Following the denial of his motion for a new trial, this timely appeal followed.

## ANALYSIS

On appeal, the Defendant argues that (1) the evidence is insufficient to sustain his convictions, (2) the trial court erred when it refused to recuse itself, and (3) the trial court erred in denying his motion to suppress evidence. The State responds that the evidence is sufficient to support the Defendant's convictions on all three counts. Additionally, the State contends that the trial did not abuse its discretion in denying the Defendant's motion to

---

[4] Shot "A" and shot "B" do not indicate which shot was fired first, but rather are just used to differentiate between the two gunshot wounds suffered by the victim.

recuse, asserting that the court's comments at the close of the motion to suppress hearing were based upon the evidence presented, not personal bias. Finally, the State maintains that the trial court properly denied the Defendant's motion to suppress because the search of the truck was justified by probable cause whether it took place at the Gregory residence or the Waverly Police Department. Upon review, we agree with the State.

**I. Sufficiency of the Evidence.** The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this Court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This Court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457)). This Court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn.

2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

In this case, the Defendant first asserts that the evidence is insufficient to establish the Defendant's identity as the perpetrator of the murder. The Defendant argues that the State's only direct evidence to link him to the scene of the crime is through the "questionable testimony" of Rachel Lucas, the wife of the victim, which is insufficient to establish the Defendant as the shooter. Additionally, the Defendant argues that circumstantial evidence presented by the State fails to connect him to the crime or prove that he was the shooter. The State responds that both the direct and circumstantial evidence presented establish the Defendant as the perpetrator.

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford,

-18-

635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In addition, as relevant here, this Court has held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

In this case, Mrs. Lucas, who had known the Defendant for thirty years, testified that the Defendant was at her home the night before the shooting and that she saw the Defendant leaving her home the next morning just minutes after the shooting. During her 911 phone call, which was played for the jury, she identified the Defendant as the man leaving her home and said, "I think I see him leaving . . . I think his name is Stuart Gregory . . . I don't know. I didn't see, but I think that's who it is." She explained her equivocal identification of the Defendant as meaning that she did not actually see the Defendant shoot the victim, but she insisted that she was certain she saw the Defendant leaving her home that morning. Furthermore, Lt. Edwards testified that Mrs. Lucas told him the Defendant was the perpetrator and never equivocated about his identity. In addition to Mrs. Lucas's identification of the Defendant, the State also presented circumstantial evidence to connect the Defendant to the scene and establish him as the shooter. Multiple witnesses testified to seeing the Defendant in the driveway of the Lucas home in the hours prior to the murder, and one witness testified that he saw the Defendant's truck leaving the Lucas property at approximately 9:00 a.m., minutes before police arrived. Numerous witnesses also testified to interacting with the Defendant immediately before and immediately after the murder, and testified to seeing him with a 12-gauge shotgun.

The State also presented expert testimony that the shotgun shells recovered from the Defendant's brother were fired from the Defendant's shotgun and that the load of those shells was consistent with the materials found in the victim's body. There was evidence that the DNA on a marijuana cigarette found outside of the Lucas home matched the Defendant's DNA, and multiple witnesses testified that the Defendant's truck had a strong odor of marijuana on the morning of the murder. Finally, the State established that the Defendant had a motive to kill the victim because the victim had been the long-time boyfriend of the Defendant's fiancée.

Based on our review of the record, affording the State the strongest legitimate view of the evidence and reasonable inferences that may be drawn therefrom, we conclude that a rational trier of fact could have found that the Defendant was the perpetrator of the crimes beyond a reasonable doubt. See Rice, 184 S.W.3d. at 662. The variations in Mrs. Lucas's trial testimony and her original statements to police were fully presented to the jury, and the jury resolved any conflicts in the evidence with their verdict. Moreover, the State presented ample circumstantial evidence from which a rational juror could have drawn the inference that the Defendant was the perpetrator, as was their prerogative. The jury was "asked to weigh the chances that the evidence correctly points to guilt against the possibility of

-19-

inaccuracy or ambiguous inference," and was convinced beyond a reasonable doubt as to the Defendant's guilt. See Dorantes, 331 S.W.3d at 380. On review, we will not substitute our own inferences for those drawn by the jury. See Sisk, 343 S.W.3d at 65 (Tenn. 2011). Accordingly, the Defendant is not entitled to relief.

The Defendant next asserts that the evidence is insufficient to sustain his conviction for aggravated robbery because there was no proof that the Defendant took money from the victim, an essential element of aggravated robbery. As such, the Defendant contends that the evidence is likewise insufficient to sustain his conviction for felony murder. We disagree. Although the evidence presented by the State to establish that the Defendant took money from the victim was wholly circumstantial, this fact does not undermine the jury's verdict. Circumstantial evidence is intrinsically no different than direct evidence, and we afford it the same level of review on appeal. Dorantes, 331 S.W.3d at 380

Robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-14-401. Aggravated robbery "is robbery as defined in § 39-13-401: (1) accomplished with a deadly weapon . . . or (2) [w]here the victim suffers serious bodily injury." Id. § 39-13-402. Additionally, first degree felony murder is defined as a "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Id. § 39-13-202(a)(2). "The killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). However, the defendant must intend to commit the underlying felony at the time of the killing. Id. at 107. Proof of the intent to commit the underlying felony, and at what point it existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107 (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

As previously discussed, the Defendant was placed at the scene of the crime by eye witness testimony and DNA evidence from a marijuana cigarette found at the victim's home. Mrs. Lucas testified that on the night before the murder, her husband had "a lot" of money in his wallet and that he routinely carried several hundred dollars. After the murder, Mr. Lucas's wallet was found on his desk completely empty. Additionally, several witnesses testified about their interactions with the Defendant immediately before the murder at the Thompson's One Stop. Each recalled that the Defendant did not have enough cash to

purchase his own cigarettes. However, after his arrest just a few hours later, nearly eight hundred dollars was found on the Defendant's person. See State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (upholding an aggravated robbery conviction based solely on circumstantial evidence including the fact that the Defendant had no money before going to the victim's apartment but had cash in his hand when he returned). The victim's cause of death was two gunshot wounds to the chest, with circumstantial evidence that linked those gunshot wounds to the Defendant's shotgun. Again, the inferences drawn from this circumstantial evidence is properly within the province of the jury, and we will not disturb their finding on appeal. Based on this evidence, a rational juror could conclude beyond a reasonable doubt that the Defendant shot the victim during the perpetration of a robbery, which is sufficient to sustain a conviction for both aggravated robbery and first degree felony murder.

Finally, although not directly raised by the Defendant in his brief, we note that the evidence is also sufficient to sustain his conviction for first degree premeditated murder. Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder as "[a] premeditated and intentional killing of another." The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

In this case, there is no evidence that the victim was armed at time of the murder, and Dr. Deering, the State's forensic expert, testified that the victim did not have any defensive wounds to suggest that the victim fought off his attacker. Additionally, as noted by the State in their brief, the State's ballistics expert testified that the two gunshots into the victim's body were fired from different distances, and the type of shotgun used by the Defendant required that he eject the spent shell from the chamber and load a second shell into the chamber in order to fire a second shot. Moreover, no shells were recovered at the scene, suggesting that the perpetrator gathered them prior to leaving. The State also presented the testimony of Jacqueline Peek, the fiancée of the Defendant, who testified that days before the murder she "confessed" to the Defendant about her twenty-four year relationship of partying with the victim. From this evidence, a rational juror could infer that the Defendant took a

weapon into the home of the victim with the motive and intention to kill him, shot the victim once and then reloaded his weapon to shoot him again, and collected the spent shells prior to leaving the victim's home, all of which supports the existence of premeditation.

**II. Recusal of the Trial Court.** The Tennessee Supreme Court has stated, "[w]hether a judge should recuse herself or himself from a legal proceeding rests within the sound discretion of the judge." State v. Cannon, 254 S.W.3d 287, 307 (Tenn. 2008) (citations omitted). An objective test is applied to determine if recusal is proper because the appearance of bias is just as injurious to the integrity of the courts as actual bias. Id. Therefore, recusal is warranted (1) if a judge has any doubt concerning his or her ability to preside over a case impartially or neutrally, or (2) when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality. Id. However, "[n]ot every bias, partiality, or prejudice merits recusal. To disqualify, prejudice must be of a personal character, directed at the litigant, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case." Alley v. State, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994) (internal citations omitted). Additionally, adverse rulings are rarely sufficient grounds to establish bias. Id. This Court will not interfere with the trial court's decision on appeal unless the record clearly shows an abuse of discretion. Cannon, 254 S.W.3d at 307.

The Defendant asserts that the trial court abused its discretion by refusing to recuse itself, pointing to the following comments made by the court at the suppression hearing as a basis for his motion:

> Let's think about what we got. We know for a fact that Eddie Lucas is dead. We have at least probable cause, if not almost a sure thing, that the killer was Stuart Gregory. He was identified. And apparently, not only did law enforcement know it, was pretty sure about it, apparently half of New Johnsonville knew it and was pretty sure about it.

The Defendant maintains that these comments call into question the court's ability to remain impartial and act as a Thirteenth Juror as required by law. The State responds the court's comments were based upon the evidence presented rather than any personal bias, and that the record is void of any indication that the trial court was unable to act as an impartial judge.

Considering these comments in context and the record as a whole, we cannot conclude that the trial court abused its discretion. In denying the Defendant's oral motion to recuse, the trial court reasoned that "the law requires at a motion to suppress or any other motions that the court make findings of fact and state its conclusions," and therefore its comments

were justified and did not warrant recusal. We agree with the trial court's rationale. At the suppressing hearing, the trial court was tasked with considering the evidence presented and determining whether probable cause existed to justify the search of the Defendant's truck. The Defendant does not suggest nor does the record reflect that the court based its ruling on some other basis outside of the evidence presented. Rather, the trial court's comments appear to be solely "motivated by *evidence* damaging to [the Defendant], not by the court's bias or prejudice against [the Defendant]." See Sizemore v. Sizemore, No. E2006-01456-COA-R3-CV, 2007 WL 2198358, at *9 (Tenn. Ct. App. July 20, 2007). The court had a duty to weigh the evidence and make a ruling accordingly. We cannot conclude that simply because it found the evidence presented to establish more than mere probable cause, but "almost a sure thing," that the trial court demonstrated actual bias or the appearance of partiality. The Defendant is unable to articulate any other actions or comments by the trial court that were improper, evinced bias, or improperly influenced the jury. Therefore, we conclude that the trial court did not abuse its discretion and the Defendant is not entitled to relief.

**III. Motion to Suppress Evidence.** An appellate court may consider the proof presented at the suppression hearing and the trial when determining whether the trial court properly denied a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). It is well-established that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Tennessee Supreme Court explained this standard in Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Id. However, this Court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; Yeargan, 958 S.W.2d at 629.

Here, the Defendant argues that the trial court improperly denied his motion to suppress evidence obtained as a result of the search of his truck. The Defendant's argument

is two-fold: (1) the vehicle was searched prior to the issuance of a search warrant, and (2) after a search warrant was issued, the affidavit in support thereof was insufficient to establish probable cause. The State responds that the trial court properly denied the motion to suppress whether it was searched at the Gregory residence or the Waverly Police Department because officers had probable cause to believe that evidence of a crime would be found, which justified the search pursuant to the automobile exception.

The Fourth Amendment to the United States Constitution and Article 1, Section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). One such exception is the automobile exception, which the Tennessee Supreme Court recently addressed in State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009):

> The "automobile exception" to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband. Carroll v. United States, 267 U.S. 132, 149 (1925). The rationale for the automobile exception is two-fold. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); California v. Carney, 471 U.S. 386, 392-93 (1985). First, it is often impractical for officers to obtain search warrants in light of the inherent mobility of automobiles. Carney, 471 U.S. at 393. Second, individuals have a reduced expectation of privacy in their automobiles. Id. If the officer has probable cause to believe that the automobile contains contraband, the officer may either seize the automobile and then obtain a warrant or search the automobile immediately. Chambers v. Maroney, 399 U.S. 42, 52 (1970). "Given probable cause to search, either course is reasonable under the Fourth Amendment.'" Id.

Moreover, this Court has recently concluded that "[n]either the federal nor the state constitution requires the existence of exigent circumstances for the automobile exception to apply." State v. Carrie Lynn Ronewicks, No. W2011-01332-CCA-R3-CD, 2012 WL 6719646, at *17 (Tenn. Crim. App. Dec. 26, 2012). Probable cause, without more, is sufficient to justify the search. Saine, 297 S.W.3d at 207.

In the present case, the trial court concluded that officers had "double probable cause" to justify the warrantless search of the truck based upon the evidence of its involvement in

a murder and based upon the officer's testimony of the strong odor of marijuana coming from the truck. The court also concluded that the affidavit supporting the search warrant "clearly establishes probable cause for the search." After a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's findings.

Although conflicting testimony was offered at the hearing as to whether the officers searched the truck at the scene or searched it later at the Waverly Police Department after obtaining the warrant, the trial court concluded that the search was justified because officers had probable cause "right then" to search the truck at the Gregory home. Chief Daniel and Sheriff Davis were both informed that the Defendant was a suspect in a homicide investigation and that his truck was seen leaving the scene of the crime earlier that morning. When they arrived at the Gregory home, they saw the Defendant's truck parked in the driveway with the driver side window rolled down. Both men testified that they smelled a strong odor of marijuana coming from the truck as they approached it, and that once they looked inside of the truck through the windows they saw a shotgun lying in plain view. We agree with the trial court that the officers had probable cause at that moment to search the vehicle without a warrant. Whether officers searched it at the Gregory house or searched it later at the police department is of no moment because "the justification to conduct a warrantless search does not vanish once the car has been immobilized." Michigan v. Thomas, 458 U.S. 259, 261 (1982); see also, Texas v. White, 423 U.S. 67, 68 (1975) (emphasizing that Chambers held "that police officers with probable cause to search an automobile at the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant."); Carrie Lynn Ronewicks, 2012 WL 6719646, at *20 (concluding that once the officer had probable cause to believe that the defendant's vehicle contained contraband, "the officer was free to search the van immediately [pursuant to the automobile exception] or have it towed and searched later pursuant to either a search warrant or . . . the inventory search exception.").

The Defendant relies upon Arizona v. Gant, 566 U.S. 332, 351 (2009), which holds that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe that the vehicle contains evidence of the offense of arrest." The Defendant's reliance upon Gant, however, is misplaced as Gant's holding implicates a wholly separate exception to the warrant requirement: search incident to arrest. Here, the State does not claim and the trial court did not find that the search of the Defendant's car was justified pursuant to a valid search incident to arrest. Rather, the court specifically held that the search was justified because officers had probable cause to search the vehicle at the scene, which implicates the automobile exception. See Chambers, 299 U.S. at 49 (citing Carroll, 267 U.S. at 158-59) (noting that the search of an automobile based upon probable cause "proceeds on a theory wholly different from that justifying the search incident to an arrest."); see also,

Leveye, 796 S.W.2d at 949 (upholding the search of a defendant's car after his arrest pursuant to the automobile exception where the car was parked in a truck stop lot approximately 75 yards from the place where the defendant was arrested).

Regarding the validity of the search warrant, the Defendant has failed to sufficiently support his claim with argument, citations to authority, or references to the record. Therefore, we deem this issue waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this [C]ourt."). In any event, the Defendant is not entitled to relief on this issue because the search of the Defendant's truck was justified by the automobile exception.

## CONCLUSION

Based upon the foregoing reasoning and authority, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE